IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH SNAPCHAT ACCOUNTS/USERNAMES **swifthardhead90** AND **swiftslime** THAT ARE STORED AT PREMISES CONTROLLED BY SNAP INC. | Case No. 6:22mj5 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Christopher Burch, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Snap Inc., a multimedia social networking company headquartered at 2772 Donald Douglas, Loop North Santa Monica, CA 90405 that developed and maintains technological products and services, namely Snapchat. The information to be searched is described in the following paragraphs and in Attachments A-1 and A-2. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Snap Inc. to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) under the United States Department of Justice. I have been employed with ATF since January 2020, and I am presently assigned to the Roanoke, Virginia Field Office. I

have successfully completed the Criminal Investigators Training Program and Special Agent Basic Training, ATF National Academy, held at the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to this employment, I was employed as a sworn police officer/Trooper for the Virginia State Police for approximately seven years. Prior to that, I was employed as a sworn police officer for the Pittsylvania County Sheriff's Office in Virginia for approximately five years. During those twelve years employed as a sworn police officer in Virginia, I conducted a wide variety of criminal investigations; to include narcotic and firearms investigations, and also procured and executed search and arrest warrants. Since becoming an ATF Special Agent, I have received extensive training, both formal and on-the-job, in the provisions of the federal firearms laws administered under Titles 18 and 26 of the United States Code. I have participated in narcotics and firearms investigations involving large conspiracies. I have utilized pen registers, geolocation data and other investigative techniques related cellular devices numerous times in the past as related to firearms and narcotics investigations. I have used Social Media exploitation in the past in furtherance of criminal investigations related to firearms, narcotics, and acts of violence. This experience has given me the knowledge to recognize the methods used by criminal violators and individuals disposed to commit criminal offenses to conceal their overall criminal activities from law enforcement personnel and other persons.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to

whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Further, my interpretations and explanations of the significance of certain events, records, and statements discussed herein may evolve or change as the investigation progresses and/or new information is discovered.

## APPLICABLE STATUTES

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(a)(6), in violation of 18 U.S.C. § 371, and 18 U.S.C. § 922(g)(1) (the "Target Offenses") have been committed by Cortez O'Bryan BAILEY. The elements of the Target Offenses are as follows:

   a. 18 U.S.C. § 922(a)(6), in violation of 18 U.S.C. § 371 (Conspiracy to Make a False Statement in Connection with the sale and acquisition of a firearm): first, there was an agreement between two or more persons to make a false statement in connection with the sale and acquisition of a firearm and, second, the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

   b. 18 U.S.C. § 922(g)(1) (Possession of a Firearm by a Convicted Felon): first, defendant knowingly possessed a firearm; second, at the time he possessed the firearm, defendant had been previously convicted of a crime punishable by imprisonment for a term exceeding one year; third, defendant knew that he was a felon; and fourth, the possession of the firearm was in or affecting interstate commerce.

5. There is also probable cause to search the information described in Attachments A-1 and A-2 for evidence, instrumentalities, contraband, and/or fruits of the Target Offenses and will lead to evidence of the Target Offenses, as well as the location where these offenses were committed, as detailed in Attachment B.

## JURISDICTION

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. I received information from the Lynchburg Police Department (LPD) Vice Unit that Cortez O'Bryan BAILEY, a previously multi-convicted felon prohibited from possessing firearms, had been observed in multiple social media video posts possessing a firearm. Specifically, between the dates of May 20, 2021, and May 30, 2021, LPD observed BAILEY possessing what appeared to be a tan Glock handgun in videos posted on BAILEY's Snapchat accounts/usernames **swifthardhead90** and **swiftslime**.[1] While monitoring BAILEY's Snapchat

---

[1] LPD constantly monitors social media and had information that BAILEY's nickname/street name is "Swift Hardhead." LPD discovered that information through CI interviews, other interviews, and consensual conversations with people who know BAILEY. With this information, LPD located and began monitoring BAILEY's Facebook account/username, Swifthardheadd. BAILEY, who is known to LPD, regularly posted pictures of himself on this Facebook account. These Snapchat accounts/usernames were linked to BAILEY's Swifthardheadd Facebook account. As with his Facebook account, BAILEY regularly posted pictures of himself on these Snapchat accounts.

accounts, the following Snapchat videos were posted and recorded by LPD law enforcement officers:

    a. On May 20, 2021, **swifthardhead90** posted a snap chat video around 1:00 am. The video showed what appeared to be a tan Glock handgun with a caption of "MY NEW BABBBY 100." In the video, a serial number—BTRL805—was able to be identified on the gun. A screenshot of the Snapchat video is attached below and incorporated herein:



b.  Shortly after the May 20, 2021 Snapchat video discussed above was posted, another video was posted under the username **swifthardhead90**. This video showed BAILEY wearing a white Nike tee shirt, riding inside of a vehicle with a tan handgun pointed at the screen of the recording device, listening to music. A screenshot of the Snapchat video is attached below and incorporated herein:



c.  On May 30, 2021, under the username **swiftslime**, a Snapchat video was posted showing BAILEY wearing a white hoodie with a black bird on the front riding inside a vehicle. In the video, BAILEY is seen pulling a tan Glock 19x series

6

handgun from his lap area and pointing it at the screen. A screenshot of the Snapchat video is attached below and incorporated herein:



8.     A trace was performed on the serial number of the Glock handgun seen in the May 20, 2021 Snapchat video. According to the trace, the firearm, a Glock Model 19X 9mm pistol, was purchased by Dominique Odell IRVING from Dick's Sporting Goods in Lynchburg, VA on May 19, 2021.

9.     A firearm interstate nexus was also conducted in reference to the handgun by a certified ATF Nexus Agent. Based on this investigation, the Agent determined that the handgun

is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3) and was not manufactured in the Commonwealth of Virginia.

10. On May 29, 2021, LPD Officers responded to an incident in the City of Lynchburg, in the Western District of Virginia (WDVA) in which Cortez BAILEY allegedly assaulted a female, Candesse Clark, and brandished a firearm by pointing it at her. In his report, LPD responding Officer Kirby stated that he had observed a photograph that BAILEY had posted on Facebook a few days prior of what appeared to be a Glock 19X. Officer Kirby also stated in his report that he showed Clark a photo of a tan Glock 19X that BAILEY had posted on his Facebook story a few days prior. Clark believed that to be the type of gun BAILEY pointed at her. Cortez BAILEY was charged and arrested for this incident; and, it should be noted that court proceedings have concluded, and BAILEY is currently serving an active two-year, six-month sentence for convictions of possessing a firearm by a convicted felon (Felony) and assault and battery of a family member (Misdemeanor.)

11. On June 7, 2021, Roanoke ATF Special Agent Davidson along with Lynchburg Police Department Investigator Babbitt went to Dick's Sporting Goods in Lynchburg, VA where they spoke to a supervising employee. SA Davidson obtained a copy of the ATF Form 4473, on which Dominique IRVING checked "Yes" on question 21. a., indicating that she was the actual transferee/buyer of the firearm listed on the form. On June 9, 2021, SA Davidson and Inv. Babbitt conducted a recorded interview of IRVING in SA Davidson's vehicle in the parking lot of Kroger, 4119 Boonsboro Rd, Lynchburg, VA. During this interview IRVING admitted to purchasing the firearm in question and falsifying information on the ATF Form 4473 in reference to her drug usage. IRVING confirmed that BAILEY was in her vehicle, in the parking lot,

waiting for her and watching her children. IRVING also admitted to obtaining money from BAILEY to help purchase the firearm, as well as handing the firearm to BAILEY in the vehicle after purchasing it. During the interview, IRVING also consented to a data extraction being performed on her cell phone, which was performed the same day. The data extraction performed on IRVING's phone revealed text message conversations between IRVING and BAILEY which suggested that IRVING was purchasing the firearm for BAILEY. These messages included IRVING sending BAILEY a picture of the firearm on the counter at the Dick's Sporting Goods during the time of purchase while BAILEY was waiting in the vehicle, discussions about BAILEY sending money to IRVING on CashApp—a mobile-phone app that allows users to transfer money to one another— and discussions about IRVING coming to the vehicle to get cash from BAILEY. The data extraction also revealed multiple CashApp transactions in the days following the purchase of the firearm on May 19, 2021 where BAILEY sent IRVING money through the app.

## BACKGROUND INFORMATION REGARDING SNAP INC.

12. Snap Inc. is headquartered in Santa Monica, California, and owns and operates a free access social networking website of the same name that can be accessed at http://www.snapchat.com. Snapchat is one of the most popular applications for sending and receiving 'self-destructing' messages, pictures, and videos. Referred to as 'snaps', the company processes approximately five billion of them every day on Apple's iOS and Google's Android operating systems. Snapchat users access the application frequently. According to marketing material provided by the company the average Snapchat user checks their account more than thirty times a day.

13. A "snap" is a picture or video message taken and shared with other Snapchat users in real-time. The sender of a snap has the option of setting a timer for how long a snap can be viewed. Once a snap has been viewed, it is deleted from the company's system and is no longer visible to the recipient. Snapchat users can send text messages to others using the Chat feature. Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible. The application notifies other users when they are online so they can begin messaging each other. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device. Pictures can also be sent from the saved pictures in the photo gallery of the device. Accessing a Snapchat account and "snaps" constitutes "electronic communications" within the meaning of 18 U.S.C. § 3123. See 18 U.S.C. §§ 3127(1) and 2510(12).

14. "Our Stories" is a collection of user submitted "Snaps" from different locations and events. A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event. For example, multiple different Snapchat users at a rave could all contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Our Stories" events if they are not actually present at the event by subscribing to the story. In addition to "Our Stories", a Snapchat user can keep a sort of photo/video diary using the "Story" feature. Each snap in a "Story" documents the user's experience. Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or just the user's friends. Stories are visible to other users for up to 24 hours.

15. In addition to photos, videos, "Snaps" and stories, "Snapcash" is an online money transfer service offered by Snapchat. The actual business platform is run by "SquareUp", the distributor of a mobile credit card reader and application Square Register. Snapcash can be used to transfer money between Snapchat users using a linked, U.S. issued Visa or MasterCard debit card only; using credit cards is not permitted. Snapcash can only be sent to other users who have a linked debit card. Snapcash has a $250 weekly limit but can be upgraded to a $2,500 weekly limit. Users who upgrade have to provide their full name, date of birth, and Social Security number.

16. While a Snapchat message may disappear, the record of who sent it and when still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a snap. Snapchat servers may also contain location data for users who have turned on location service and opted into location services in the app settings including frequent locations, latest locations, top locations, and locations the user has visited. Additionally, Snapchat stores the number of messages exchanged, which users they communicate with the most, message status including if and when the message was opened, and whether the receiver used the native screen capture function of their device to take a picture of the snap before it disappeared.

17. Snapchat asks users to provide basic contact and personal identifying information to include date of birth. When a user creates an account, they make a unique Snapchat username. This is the name visible to other Snapchat users. An email address is required to register a Snapchat account and a new user must also provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code, which must be

entered before proceeding with the registration step. However, a user may elect to bypass entering a phone number so one may not always be present in the user's account. Snapchat also retains the account creation date.

18. Snapchat stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. They also collect unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat. In the event the Snapchat user's application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

19. In general, providers like Snapchat ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number).

20. Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to

the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

21. In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

22. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Snapchat to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

23. Based on the forgoing, I request that the Court issue the proposed search warrant.

24. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

25. The government will execute this warrant by serving the warrant on Snapchat. Because the warrant will be served on Snapchat, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

26. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

s/Christopher Burch
Christopher Burch
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Received by reliable electronic means
and sworn and attested to by telephone this
___13th___ day of July 2022.

*Robert S. Ballou*
_____
HONORABLE ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE

14